**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CLARK K. GARRIS,** : | |
| : | **CIVIL ACTION NO. 3:98-2047** |
| **Plaintiff** | |
| : | **(VANASKIE, J.)** |
| **V.** | **(MANNION, M.J.)** |
| : | |
| **JO ANNE B. BARNHART**[1]**,** | |
| **Commissioner of Social** : | |
| **Security Administration,** | |
| : | |
| **Defendant** | |
| : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("SSI"), under Title XVI of the Social Security Act, ("Act"). 42 U.S.C. §§ 1381-1383f.

**I. Procedural Background**

The plaintiff protectively filed his application for benefits on April 30, 1996, alleging disability since June 7, 1990, due to hearing loss and migraine headaches. (TR. 101). The application was denied initially and the plaintiff

---

[1] Jo Anne B. Barnhart became the Commissioner of Social Security effective November 14, 2001. Under Fed.R.Civ.P. 25(d)(1) and 42 U.S.C.§ 405(g), Jo Anne B. Barnhart is automatically substituted as a defendant to this action.

requested a hearing before an Administrative Law Judge ("ALJ"), which took place on July 9, 1997.  The ALJ issued a decision on November 14, 1997, which denied the application.  The ALJ concluded that although the records demonstrated chronic ear infections, and resulting moderate permanent 30 decibel hearing loss, there was no other evidence to suggest any impairment which would meet or equal any of the Listed Impairments found in Appendix 1, Subpart P, Regulation No. 4;

The plaintiff filed a timely request for review.  The Appeals Council vacated and remanded the ALJ's decision on March 7, 2000, because the cassette recording of the hearing could not be located.

A second hearing was held on October 31, 2000.  At that time the plaintiff had amended his application for benefits to include illiteracy and a psychotic impairment. The plaintiff's claim was again denied on February 20, 2001. The ALJ concluded that although the plaintiff did have a combination of impairments which placed significant restrictions upon his ability to perform basic work-related functions, he was nevertheless capable of performing a wide range of simple, repetitive work on a sustained basis.

The plaintiff appealed to the Appeals Council on March 22, 2001.  On December 18, 2001, the Appeals Council again remanded the matter.  The Appeals Council directed that the Commissioner assign an ALJ to evaluate the plaintiff's mental impairments pursuant to Section 12:00 of the List of Impairments, and to give further consideration to the plaintiff's maximum

2

residual functional capacity. (TR. 178).

A third hearing was held on May 5, 2003. The plaintiff testified, as well as Joseph J. Kuhar, a vocational expert. The plaintiff was represented by the same counsel who represents him in this appeal. The ALJ once again denied the application by decision dated May 28, 2003.

The ALJ concluded that: the plaintiff had not engaged in any substantial gainful activity at any time since the alleged onset of disability; that the plaintiff had impairments which in combination are severe, but not so severe as to meet or equal one of the listed impairments found in Appendix 1, Subpart P, regulation No. 4; that the plaintiff had no past relevant work; that the plaintiff's allegations regarding his combined mental and functional limitations were not totally credible, and that he retained the residual functional capacity to perform a range of simple, repetitive work which would require no more than incidental interaction with the public, and not in a noisy or loud environment. The ALJ further concluded that a significant number of appropriate jobs existed in the regional, state and national economies for a person such as the plaintiff. As a result, the ALJ concluded that the plaintiff was not under a disability as defined in the Social Security Act at any time relevant. (TR. 17-23).

The plaintiff filed a request for review of the ALJ's decision. The Appeals Council declined further review on October 17, 2003, making the ALJ's determination the final decision of the Commissioner. (TR. 5-6).

The plaintiff, thereafter, filed an appeal with the Commissioner. On

November 3, 2004, the Commissioner filed a motion in this court to reopen the case, which was granted on November 4, 2004. (Doc. No. 11).[2]  The Commissioner filed an answer on November 5, 2004. (Doc. No. 12). The plaintiff filed a brief in support of his appeal on January 29, 2005 (Doc. No. 17).  The Commissioner filed a brief in support of the answer on February 25, 2005. (Doc. No. 18).

## II. **Disability Determination Process**

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 CFR § 404. 1520 (2000).

The instant action was ultimately decided at the fifth step of the process, when the ALJ determined that, although the plaintiff's impairments prevented him from performing his past relevant work activity, they did not prevent him from performing a number of vocationally appropriate light level, unskilled,

---

[2]See, in general, Docket No. 3:CV-98-2047.  The original complaint was filed in this court on December 17, 1998. Doc. No. 1.

routine jobs which are available in the regional, as well as state and national economies.(TR. 16, 18).

III. **Evidence of Record**

The plaintiff was born on January 11, 1977, and was 19 years old at the time the application for Social Security Disability benefits was filed on April 30, 1996. He has an 11th grade education, and no relevant work history. He alleges disability since June 7, 1990. (TR. 184, 190). He was 26 years old as of May 28, 2003, the date of the decision under review. At the time of the final hearing in this matter the plaintiff was incarcerated, which is discussed in more detail below.

The plaintiff's original application for benefits alleged disability due to hearing loss and migraine headaches. In later proceedings the plaintiff also alleged that he was functionally illiterate and that he had a psychotic disorder.

There are very few medical records in the file. An MRI of the brain dated August 12, 1991, demonstrated a linear periventricular white matter signal around the atrium of the right lateral ventricle, probably representing a birth injury of a mild degree. It was recommended that the plaintiff follow up with an Ear, Nose and Throat physician. (TR. 208).

The plaintiff treated with Raymond Aldridge, M.D. Dr. Aldridge's records reveal that the plaintiff was treated for chronic ear infections, mostly in the right ear ("chronic otitis"). (TR. 210-213). The treatment consisted primarily of

administration of antibiotics, however, the plaintiff did undergo surgery on September 9, 1996, which consisted of a modified radical mastoidectomy. (TR. 231). Dr. Aldridge stated in a report to the plaintiff's attorney dated September 17, 1996, that the plaintiff had a permanent hearing loss of "about 30 decibel deficit." Dr. Aldridge stated also that "[o]ther than the hearing deficit, he should not have any other significant disabilities. (TR. 231).

The plaintiff also treated with the Family Practice Clinic of Guthrie Clinic, Sayre, Pennsylvania. He was treated for a puncture wound to the foot, gastroenteritis, and headaches. (TR. 232-234, 238). Due to the headaches, the plaintiff underwent an MRI on August 1, 1997. It was essentially negative, except for small retention cysts in both the right and left sinuses. (TR. 239).

The plaintiff underwent a psychiatric hospitalization at Robert Packer Hospital during the period July 23, 1999 through July 27, 1999. An intake summary report of the same date indicates that the plaintiff sought treatment through the hospital emergency room, after being accused of molesting a six year old girl. As it would transpire, it was discovered that the child was the plaintiff's five year old niece. (TR. 260). The intake report also indicates that the plaintiff was on probation for a prior indecent assault. (TR. 240). A discharge summary dated July 27, 1999, indicates as diagnoses: Axis I, Adjustment disorder with mixed emotions; Axis II, Rule out schizotypal personality disorder; Axis III, Hearing loss in right ear; Axis IV, On probation; Axis V, 40-50. It was noted that the plaintiff reported hearing voices which talk

in a different language which he cannot understand; that he believed that demons were inside him, and that he had a vision of Jesus. He said that if he had to go back to jail he would kill himself. The recommendation was that he continue with a partial hospitalization program. (TR. 244-245). If the plaintiff participated in a partial psychiatric hospitalization, there is no record of it in the file.

The plaintiff was incarcerated at the State Correctional Institution at Mercer, Pennsylvania. The records indicate that he was sentenced to one to six years incarceration for indecent assault and corruption of minors, and that he had already served 2 years in a county jail. (TR. 259).

Medical and psychiatric records from the prison indicate no serious medical problems. On intake on February 8, 2001, he was assigned to regular housing, regular employment and regular activities. (TR. 256). A psychological evaluation dated April 19, 2001, indicated low risk for suicide potential, an intellectual function Beta Quotient of 74 indicating "borderline range of mental ability" and that the plaintiff was cooperative, but not honest in responses regarding his criminal history. It was noted that his "motivation for treatment seems low and he is apt to see little need for changes in his behavior." Treatment recommendations included programs for interpersonal skills and a sex offender program. (TR. 257-258).

A follow-up Psychological Evaluation and Clinical Risk Assessment performed at SCI-Mercer for parole suitability dated September 3, 2002,

indicated that the plaintiff's veracity for self-disclosures was highly suspect. For example, he reported a work history as an auto mechanic and that he was working towards a GED. The reviewer noted that his records indicated that he was in Adult Basic Education classes and nowhere near prepared to take the GED exam, and that he had not been admitted into an automotive class due to his poor reading skills. It was noted that he self-terminated involvement in the sex offender programming, civic responsibilities and life skills group, despite that he had requested these programs. In general, however, the mental status review was within normal limits. (TR. 260). His Stability Score was "A", indicating minimal psychological impairment. (TR. 261). He was noted to be functionally illiterate and had a fifth grade reading level. His prognosis for pro-social adjustment was assessed as poor due to "his guardedness and unwillingness to be frank about sexual issues." (TR. 261). Positive factors included "favorable institutional adjustment, with clear conduct record" and "no current salient evidence of a major psychological [problem] requiring a psychiatric referral." (TR. 262).

An Agency non-treating, non-examining physician performed a records review on December 22, 1998, which indicated no disability other than moderate hearing loss. (TR. 217-224).

The plaintiff testified at the hearing held on May 5, 2003. The hearing was conducted at SCI-Mercer. The plaintiff stated that he had not worked at any time since the date of the application, April 30, 1996, and that he has been

incarcerated since 1999. (TR. 72). He stated that he has a hearing problem, but that he does not have or use a hearing aid. He reported having migraine headaches, which can last up to one day, and which occur "like every other month." (TR. 73).

As relates to any mental impairment, the plaintiff testified that he gets depressed but that he would "try to deal with it, you know, by myself." (TR. 75). He stated that he did not receive any psychiatric treatment at the prison and that he was not on any kind of medication whatsoever. (TR. 75).

The plaintiff stated that he works as a janitor and that he cleans the shower room at the prison, and that the job takes about an hour and a half each day. He said that when he feels depressed he sleeps a lot. He said that he watches TV a good part of the day and that in the evening he goes to GED classes. (TR. 77-78).

The plaintiff stated that he finished 10th grade and that he was in special education classes. (TR. 81). He said he was presently participating in regular GED classes, and that he was sometimes able to keep up with the classes and that at other times he would have trouble, such as with "geometry or something hard." (TR. 82). He reiterated that he had not had any kind of psychiatric treatment while incarcerated, and he suggested that the reason he declined to seek counseling was because he had no confidence in the prison physicians. (TR. 84).

Joseph J. Kuhar, a vocational expert also testified at the hearing. The

ALJ asked him to assume that the plaintiff was of borderline intellectual functioning; had a moderate hearing impairment which would require no exposure to loud noises; that he had no past relevant work, and should be limited to simple repetitive tasks that would require only incidental interaction with the public.  Mr. Kuhar said that there were many jobs which the plaintiff could perform including stock clerk, janitor, and cleaner. (TR. 88). Asked to assume either a psychotic or migraine impairment requiring up to two days off per month, Mr. Kuhar stated that most employers of the types of jobs identified would tolerate up to three days per month. (TR. 91).

## IV.  Discussion

The plaintiff argues that the Commissioner committed several errors at the administrative level.  Specifically, the plaintiff avers that the ALJ: (1) erred in failing to give special significance to opinions of the plaintiff's treating physicians; (2) erred in failing to properly address the plaintiff's testimony regarding his usual daily activities; (3) erred in failing to consider the plaintiff's combination of impairments in formulating hypothetical questions to the vocational expert, and (4) erred by failing to disregard much of the plaintiff's testimony as exaggeration in light of the plaintiff's mental impairment.  He maintains that the decision of the ALJ is not supported by substantial evidence, and that a more balanced review of the record must compel the conclusion that he was disabled from any kind of gainful activity as of April 24,

1996, the alleged onset date of disability. He requests that this court reverse the ALJ's decision and substitute an award of benefits. (Doc. No. 17).

The Commissioner responds that the sole issue is whether substantial evidence supports the ALJ's finding that, despite his impairments, the plaintiff retained the residual functional capacity to perform a range of available simple repetitive jobs, thus dictating a finding of "not disabled" as defined by the Act. (Doc. No. 12).

After carefully reviewing the record, it appears that the ALJ's findings are supported by substantial evidence in the record. Thus, the decision should not be disturbed on appeal.

Although the plaintiff has set forth four separate claims of error, the plaintiff's appeal has no merit because the record is devoid of evidence of severe disability. The plaintiff states that the ALJ erred in failing to assign special significance to "treating source opinions" regarding his mental impairments. The plaintiff states:

> Before his incarceration in the State Prison System, the Plaintiff's treating physician Dr. Kahn, indicated that the Plaintiff had an Adjustment Disorder with mixed emotions and had a GAF between 40 and 50, that he had Suicidal Ideation with Psychotic symptoms. (TR. 244-245). A licensed Psychologist Judy Raab evaluated him because he "speaks of demons inside of him, and hearing voices which other people do not hear which threaten to harm him." He was given an MMPI-2 and the results were consistent with severe psychopathology rather than malingering. Instead he showed evidence of paranoia. (TR. 246).
> The prison licensed psychology manager stated that the Plaintiff's mental review status was "within normal limits." (TR. 259-262). The ALJ should not have considered this opinion since

11

>it was not from a treating source or a licensed physician or psychologist.

(Doc. No. 17, pp. 10-11).

Under the "treating physician doctrine," greater weight must be given to the findings of a treating physician than to the findings of a physician or medical consultant who examined the claimant only once. Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Cruz v. Massanari, 2001 WL 11559855 *3 (E.D. Pa.)), quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). On the other hand, a treating physician's statement that a claimant is disabled is not binding on the Commissioner. Congress has determined that the Commissioner is solely responsible for deciding whether a claimant has met the Act's statutory definition of disability. 42 U.S.C. § 405(b), See 20 C.F.R. § 404.1527(e)(1). A particular diagnosis by a treating doctor does not automatically entitle a claimant to social security disability benefits. Whatever the diagnosis, the claimant must still provide sufficient evidence that he has met the Act's statutory definition of disability. An ALJ, however, may not reject the opinion of a treating physician, even if it is contradicted by opinions of other doctors, without providing specific and legitimate reasons supported by substantial

evidence in the record. Rollins v. Massanari, 261 F.3d 853 (9th Cir. 2001).

Initially, we note that there is no evidence in the record to suggest that either Dr. Kahn or Psychologist Judy Raab had any more contact with the plaintiff than did the prison psychology manager and staff, so as to ascribe to either of them the presumption of the treating physician doctrine.

The report of Dr. Kahn relied upon by the plaintiff is the Robert Packer Hospital discharge summary dated July 27, 1999. The plaintiff was admitted through the hospital emergency room on July 23, 1999, and was discharged four days later. The reason the plaintiff sought treatment was that he had just been informed by police of suspicion of sexual assault of his five year old niece. He was at that time on parole for a prior indecent assault conviction. Considering the plaintiff's circumstances at that time, it would not be unusual for him to present with "evidence of paranoia." (TR. 246).

Of particular note, Dr. Kahn concluded in his report of July 27, 1999:

> Hospital Course: the patient was admitted on July 23rd because he was expressing suicidal ideation with some mild psychotic symptoms. He was evaluated on July 24th and expressed feeling very scared of the police as he was on probation. He was observed in the unit for signs and symptoms of depression and psychotic symptoms. His mood started to improve and he was talking to the staff on the unit and the ward therapeutic milieu. He was evaluated on July 26th and I requested an MMPI to rule out any malingering. He denies any suicidal ideations. He continued to be slightly suspicious and guarded. He was evaluated on July 27th and contacted for safety. He denies any suicidal ideation. He said he has to go to the police station today, but feels strong that if something happens, he will be able to deal with it. He was discharged and will follow up in partial hospital program. I will follow-up the MMPI results in

13

partial.

(TR. 244-245). Dr. Khan also noted that the plaintiff was not on any medications. Furthermore, if the plaintiff did participate in a partial psychiatric hospitalization, there are no records of it in the file, and the plaintiff did not admit to a partial hospitalization to prison personnel. (TR. 260-261).

As to Psychologist Judy Raab's report of July 27, 1999, it states only that the statistical raw data results of the MMPI indicated that the plaintiff was not malingering; that "he did endorse rather extreme pathology...that measuring paranoia...[i]n particular he was quick to acknowledge extreme symptoms suggestive of persecutory ideas," and that "there is legitimate psychopathology involved, specifically many psychotic symptoms." (TR. 246).

We note that neither Dr. Khan nor Psychologist Raab opined that the plaintiff was disabled as a result of a mental impairment. Furthermore, to the extent that either reported that the plaintiff appeared to be paranoid or delusional, the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. Craig v. Chater, 76 F.3d 585, 590 n. 2 (4th Cir. 1966). An ALJ may discredit a physician's opinion on disability that was premised largely on a claimant's own account and symptoms and limitations when the claimant's complaints are properly discounted. Fair v. Bowen, 885 F. 2d 597, 605 (9th Cir. 1989).

Regarding the plaintiff's alleged mental impairment the ALJ stated:

Specifically, there is not evidence of a mental impairment

14

> imposing functional limitations of the severity needed to establish any conditions in Sections 12.00 et seq. Within the confines and necessary restrictions of prison life, Mr. Garris's mental impairments have resulted in only mild restrictions of daily living. As indicated, he testified that he is able to care for personal needs such as bathing and dressing. He works as a janitor and attends classes for his high school equivalency diploma each day, goes to meals, and watches TV. Testing conducted in prison in April 2001 and September 2002, indicated no more than moderate difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace...Moreover, there is no evidence of any episodes of decompensation of extended duration, or a severe mental impairment lasting for two or more years with signs and symptoms continuing despite medication or psychosocial support, so as to satisfy the "B" or "C" criteria requirements of the listing for mental disorders in Appendix 1, Subpart P, Regulations No. 4

(TR. 19)(citation to record omitted). The two evaluations referred to by the ALJ were done in order to assess the plaintiff's suitability for parole. While both evaluations showed the plaintiff to be functionally illiterate with borderline intelligence, there was nothing in either report to suggest a mental impairment so severe as to meet or equal the criteria set for in Section 12.00 et seq. In fact, it was noted that the plaintiff had a "favorable institutional adjustment with a clear conduct record, [and] no current salient evidence of a major psychological [problem] requiring a psychiatric referral. (TR. 262). Thus, there is substantial evidence to support the ALJ's conclusion that the plaintiff did not have either a physical or mental impairment so severe as to prevent him from performing a range of simple repetitive work, with limited contact with the public.

The plaintiff's remaining complaints also deal with his alleged mental

impairment, and thus do not establish cause to disturb the findings of the ALJ. The plaintiff claims, first, that the ALJ "failed to properly address the testimony of the plaintiff regarding his usual daily activities. ..[t]he ALJ alleged because the Plaintiff was able to function in the regimented prison setting, he would be employable outside of prison." (Doc. No. 17, p. 11).  Second, the plaintiff argues that the ALJ erred in failing to properly address the plaintiff's testimony regarding his usual daily activities, and that he erred by failing to disregard much of the plaintiff's testimony as exaggeration, in light of the plaintiff's mental impairment.

In effect, the plaintiff is arguing that the ALJ should disregard the plaintiff's testimony (which was largely to the effect that he has a hearing problem, and is occasionally depressed, but that he has no severe neurological or mental limitations) because the plaintiff has consistently been documented as a prevaricator, with few "marketable" skills. The ALJ stated regarding this argument:

> In his May 6, 2003 letter, counsel in essence argues that statements made by prison psychologists that Mr. Garris tended to be "evasive" and "less than honest" in his response to questioning actually provide **support** for a finding of disability...On the contrary, the undersigned believes that this only further supports a conclusion that Mr. Garris['s] allegations as to the severity of symptoms and functional limitations are not credible.
>
> At the hearing, the Administrative Law Judge observed that Mr. Garris appeared alert.  He manifested no outward problems with concentration or memory, and was able to adequately recall important events, dates, names, etc. The claimant communicated well, and responded to questions appropriately and with

reasonable intelligence.  There was nothing to indicate that he could not meet the demands of simple, repetitive work.

(TR. 21)(emphasis in original).  Credibility determinations as to a claimant's testimony regarding his limitations are for the Administrative Law Judge to make.  VanHorn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the Administrative Law Judge's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).  As indicated above, the ALJ's credibility determinations regarding the plaintiff's alleged mental impairments are supported by substantial evidence of record, and should therefore not be disturbed on appeal.

The plaintiff's final argument is that the ALJ erred in failing to pose a hypothetical to the vocational expert which identified "all of the Plaintiff's impairments." (Doc. No. 17 p. 12).  He believes that the ALJ had a duty to further develop the record and to have arranged for an independent consultative psychiatric and neurologic examination of the plaintiff.

20 C.F.R. § 416.917 relates to consultative examinations and states:

416.917 Consultative examination at our expense.

If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests. We will pay for these examinations. However, we will not pay for any medical

17

> examination arranged by you or your representative without our advance approval. If we arrange for the examination or test, we will give you reasonable notice of the date, time, and place the examination or test will be given, and the name of the person or facility who will do it. We will also give the examiner any necessary background information about your condition.

20 C.F.R. § 416.917. An ALJ has a duty to develop a full and fair record in social security disability cases. Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995). The ALJ's duty to develop the record in this regard can be done "either by remanding the case for further development, by seeking medical assistance, or perhaps by soliciting testimony from the claimant. Id. Where there is a suggestion of a mental impairment, the ALJ must develop the record "by inquiring into the present status of impairment and its possible effects on the claimant's ability to work." Plummer v. Apfel, 186 F.3d 422, 434 (3d Cir. 1999). This duty does not require a consultative examination unless the claimant first establishes that such an examination is necessary to enable an ALJ to make the disability decision. Thompson v. Halter, 2002 WL 2004569, at *3 (3d Cir. June 3, 2002)(citing 20 C.F.R.§ 416.917 and Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977). There is nothing in the record, or the plaintiff's testimony, to suggest that a psychiatric or neurologic consultative examination was necessary.

In summary, the ALJ had substantial information from which to conclude that the plaintiff did not have a physical or mental impairment so severe as to preclude simple, repetitive employment. As a result, the ALJ did not err in this

regard. Therefore, the decision of the Commissioner should be affirmed.

## V. Recommendation.

On the basis of the foregoing, **IT IS RECOMMENDED THAT**:

the plaintiff's appeal be **DENIED**.

s/ Malachy E. Mannion

MALACHY E. MANNION
United States Magistrate Judge

Dated: June 17, 2005

O:\shared\REPORTS\1998 Reports\98-2047.wpd